UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

JOSEPH BELL,

        Plaintiff,

        v.                            Case No. 04-C-0926

RICK LYONS,
GLENDA MEEKS,
BILL JOHNSON,
and MARK ZBIERANEK,

        Defendants.

DECISION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS MOOT, DENYING PLAINTIFF'S
MOTION FOR DECLARATORY RELIEF  AND COMPENSATORY SETTLEMENT AND
DISMISSING CASE

On May 8, 2006, defendants filed a motion for summary judgment on the

grounds that defendant William C. Johnson lacks the requisite personal involvement with

plaintiff Joseph Bell, plaintiff cannot prove a violation of his due process or equal protection

rights, and that all defendants are entitled to qualified immunity.  Defendants explained to Bell

that all of their factual assertions presented in support of summary judgment would be

accepted as true unless Bell submitted affidavits or other admissible evidence contradicting

these assertions.  In addition, defendants attached the relevant portions of the federal and

local rules.

Plaintiff Joseph Bell never filed a brief in opposition to the motion for summary

judgment or otherwise responded to the defendants' proposed findings of fact.  Instead, he

filed a motion for discovery, which he intended to be his response. Consequently, this court conducted a status conference on May 17, 2006, during which it denied Bell's motion for discovery and provided Bell with another copy of the defendants' motion. The court explained that Bell must respond to the summary judgment motion with affidavits or evidentiary material, and granted Bell an additional twenty-one days to file a brief in opposition to the defendants' motion for summary judgment. However, Bell never complied with the order and, instead, filed his own motion for summary judgment.

Even pro se litigants must follow rules of civil procedure. *See McNeil v. United States*, 508 U.S. 106, 113, 113 S. Ct. 1980, 124 L .Ed. 2d 21 (1980). Because Bell had the opportunity to file a brief in opposition to summary judgment that complied with the federal and local rules and failed to do so, this court will use the defendants' statement of material facts in determining whether summary judgment is proper. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). At the same time, those facts will be viewed in the light most favorable to Bell. *Id.*

## FINDINGS OF FACT

At all times relevant to this action, Bell was on parole from the Wisconsin prison system following his March 30, 1987, conviction for second degree murder-robbery. (Aff. Lyons, ¶ 5; Aff. Meeks, ¶ 17; Aff. Zbieranek, ¶¶ 14, 10, Ex. A) The underlying offense involved the strangulation death of a woman in the course of a robbery at her residence. (Aff. Zbieranek*,* ¶13; Aff. Meeks, ¶ 16, Ex. B) Although Bell received a seventeen-year sentence, he was released on a parole grant in April of 1995. (Aff. Zbieranek, ¶ ¶ 11, 14; Aff. Meeks, ¶ 17, Ex. C, p. 1)

On May 21, 1998, Bell's parole was revoked and Bell returned to the Wisconsin prison system. (Aff. Zbieranek, ¶15; Aff. Meeks, ¶ 18, Ex. D) Bell violated his rules of parole by providing his probation and parole (P&P) agent with false written information, striking a woman in the face, taking this woman's four-year-old daughter from her residence without the mother's consent, and changing his residence without his agent's consent. (Aff. Zbieranek, ¶ 16, Aff. Meeks, ¶ 19, Exs. C and D) In the revocation decision, the Administrative Law Judge noted Bell's ". . . past serious conduct toward females . . ." and ". . . ongoing aggressive conduct toward women . . . " (Aff. Zbieranek, ¶ 17; Aff Meeks, ¶ 20, Ex. D, p. 3)

In May of 2000, Bell reached his mandatory release (MR) date. Wis. Stat. § 302.11. The MR date is the statutorily determined date upon which an individual must be released to parole regardless of his progress toward rehabilitation and regardless of the public safety. (Aff. Zbieranek, ¶ 19, Aff. Meeks, ¶ 22, Ex. E) Bell was transferred to the supervision of P&P Agent Rick Lyon.

Lyon, a named defendant, began working as a P&P Agent with the Wisconsin Department of Corrections (DOC) Division of Community Corrections (DCC) in July of 1999. (Aff. Lyons, ¶ 1) After starting in the Mental Health Unit, Lyon transferred in September of 2003 to the Parole Unit where he continues to work today. Lyon supervised Bell's parole until September of 2003. At that time, Bell's supervision was transferred to P&P Agent Johnson. (Aff. Lyon, ¶ 6.) The duties of P&P Agents include the following:

> Under general supervision, [P&P Agents] are responsible for the provision of services to protect the public by holding offenders accountable for their behavior; the preparation of case plans for offenders; fostering law abiding behavior, and positive participation of individual offenders in the community; the preparation of accurate and timely investigations, reports and case records; community outreach activities, liaison activities and

3

other special assignments as required. P&P Agents provide a variety of services for a targeted caseload or program in one or more of the following areas: intensive sanctions, sex offender, mental health, drug, high risk, program liaison, interstate compact, and/or other programs identified by the supervisor. Decisions that have a serious consequence for the officer or community require prior approval by the supervisor. P&P Agents shall comply with the department's administrative rules and the agency's policies and procedures. These activities will require the physical ability to gain access to all types of buildings and operate in all weather conditions.

(Aff. Lyon, ¶ 3; Aff. Johnson, ¶ 3)

While under Lyon's supervision, Lyon had Bell taken into custody on one occasion. (Aff. Lyon, ¶ 9) On January 2, 2003, Bell called Lyon's office at 7:30 p.m. and left a message that Bell's wife, Kay Griffin, was harassing him. Bell further stated that he would come to the office the next day to discuss the matter with Lyon. (Aff. Lyon, ¶ 10.) Next, Griffin left a message indicating that on December 6, 2002, Bell had ripped the phone out of the wall and had thrown it at Griffin, striking her leg. She also accused Bell of stealing $60 from her. (Aff. Lyon, ¶ 11)

Shortly thereafter, Bell called Lyon again and left a message indicating that Griffin was going to accuse him of stealing money. Also, Bell indicated that he had watched his wife strike herself with the phone, and that she had told Bell that she was going to blame him for it. (Aff. Lyon, ¶ 12)

After the second call from Bell, Griffin called again but did not leave a message. Lyon's phone had caller ID, which allowed Lyon to see the name and number of the caller. (Aff. Lyon, ¶ 13) Bell's calls came from a different number than Griffin. All four calls were placed between 7:30 p.m. and 8:00 p.m. on January 2, 2003. (Aff. Lyon, ¶ 14)

4

On January 3, 2003, Lyon contacted the DCC supervisor who was covering for his ususal supervisor, Glenda Meeks, because Meeks was not available. Lyon discussed the previous night's phone messages with the supervisor covering for Meeks. (Aff. Lyon, ¶ 15)

Under Wis. Admin. Code § DOC 328.22(a), a client must be taken into custody and detained if the client is alleged to have been involved in assaultive or dangerous conduct. In light of Bell's murder offense and his prior problematic supervision history, Lyon felt it was particularly important to take Bell into custody and detain him pending an investigation into allegations of the kind made by Griffin. (Aff. Lyon, ¶ 16)

On the basis of the previous night's phone messages, Lyon deemed the alleged behavior by Bell assaultive and dangerous and concluded that there was sufficient evidence warranting Bell's detention under § DOC 328.22(1), pending an investigation. The supervisor Lyon contacted approved this arrest and detention. (Aff. Lyon, ¶ 17) Lyon contacted Bell and directed him to report to his office on January 3, 2003. Bell reported as required, and was detained pending an investigation. (Aff. Lyon, ¶ 18)

While Bell was detained, Lyon received a call from Latasha Carter, Bell's roommate, who indicated that Griffin had come to their house and threatened to get Bell locked up. She said that she witnessed Griffin being assaultive, and it was not the first time she had witnessed such behavior from Griffin. (Aff. Lyon, ¶ 2)

Lyon met with Bell on January 6, 2003, and Bell addressed Griffin's allegations. Most of Bell's statements confirmed the information that Lyon had received from Carter. (Aff. Lyon, ¶ 21.)

5

Later that day, Griffin told Lyon that Bell had hit her and taken her money. Since the alleged incident took place a month before, Lyon asked Griffin why it took so long to report it. Griffin said she did not want to get Bell in trouble. (Aff. Lyon, ¶ 22)

Ten minutes after Griffin left Lyon's office, she called Lyon and said that she wanted to go off the record to report that Bell was "dope dating," i.e., having sex with women in exchange for drugs. Lyon asked Griffin why she hadn't reported that earlier in the day, and Griffin responded that she didn't want to get Bell in trouble. (Aff. Lyon, ¶ 23)

On January 8, 2003, Lyon discussed the circumstances, including his prior observations of Bell and Griffin with his supervisor, Glenda Meeks. Lyon had seen them in a fight in which Griffin was verbally aggressive and slamming objects around the house.[1] Lyon, who had been concerned for Bell's safety and his own, left and directed Bell to leave the house. (Aff. Lyon, ¶ 24) In light of this prior observed interaction, as well as Bell's statement and Carter's statement, Meeks and Lyon concluded that there was insufficient proof to revoke Bell's parole. (Aff. Lyon, ¶ 25) Consequently, Meeks and Lyon decided to release Bell from custody. However, they directed Bell to attend an anger management

---

[1]Defendant Glenda Meeks has been employed by DOC DCC as a Corrections Field Supervisor since January of 1992. Duties include the following: supervise a minimum of ten or more staff consisting of agents, Office Operations Assistance staff and supervisors, and interns; approve custodies, sanctions and appropriate discipline for violations; review court documents, revocation summaries and packets, alternatives to revocations, case transfers, inter-state compact requests, early discharges, search requests and apprehension requests; review and respond to offender and public concerns or complains, as well as responds to correspondence on behalf of Department of Corrections regional office and/or Secretary's office; and manage and develop databases, conduct preliminary hearings, serve as the hearing magistrate, participate in interviews and selection process of candidates, complete performance evaluations and participate in disciplinary investigations. In addition, Meeks conducts staff meetings and supervisory conferences and establishes and maintains ongoing relationships with a vast array of intra/inter agencies, law enforcement, courts and community agencies, as well as performing a vast variety of other duties and tasks as assigned.

(Aff. Meeks, ¶ 3)

course, because Griffin had previously obtained a restraining order to preclude Bell from assaultive conduct. (Aff. Lyon, ¶ 26)

Bell was released from custody on January 10, 2003, with Meeks' approval. (Aff. Lyon, ¶ 27) Lyon had no knowledge of the use of a gun in the incident underlying Bell's arrest and detention and never told Bell that he was being confined because of a gun-related incident. Lyon explained to Bell when he was taken into custody and when he took Bell's statement that his wife's claims of assault were the reasons for his detention. (Aff. Lyon, ¶ 28)

Lyon was not required to offer Bell the option of taking a lie detector test prior to taking him into custody or during his investigation. On the other hand, under Wis. Admin. Code § DOC 328.22(1), Lyon was required to take Bell into custody and detain him pending an investigation into the alleged underlying incident. Also, there was no substantial correctional reason to conduct a lie detector test on Bell in the course of Lyon's investigation. (Aff. Lyon, ¶ 29)

The only incident involving a gun during Bell's parole supervision occurred subsequent to his detention. Bell accused his cousin of hiring someone to shoot him. Bell's differing versions of this incident were so inconsistent that Lyon was unable to determine if there was any truth to the murder-for-hire allegation. (Aff. Lyon, ¶ 32)

Defendant William C. Johnson supervised Bell on parole from September 22, 2003, to August 27, 2004. (Aff. Johnson, ¶ 4) Bell's DCC supervision file indicates that he was taken into custody on June 16, 2004, with the approval of Johnson's supervisor, Meeks. Bell remained in custody pending investigation until June 21, 2004, when he was released. (Aff. Johnson, ¶ 5)

The supervision file indicates that while Johnson was on vacation in early June of 2004, Kim Jones called a P&P Agent (other than Johnson) and reported that Bell had been stalking and harassing her.[2] The other P&P Agent told Johnson about the phone call from Jones about Bell when Johnson returned to work on June 21, 2004, the day of Bell's release from custody . (Aff. Johnson, ¶ 10) Johnson visited with Bell on June 30, 2004. (Aff. Johnson, ¶ 11)

Johnson did not participate in the decision to confine Bell on a parole hold in June of 2004 or the decision to release Bell from custody on June 21, 2004. Both decisions were made while Johnson was on vacation and out of the office. (Aff. Johnson, ¶ 12) Further, Johnson did not participate in the investigation concerning Bell's behavior in conjunction with his June 2004 parole hold. (Aff. Johnson, ¶ 13) Moreover, Johnson did not participate in the decision to release Bell on an Alternative to Revocation (ATR) agreement in lieu of seeking revocation of his parole. (Aff. Johnson, ¶ 14, ¶ 16)

In Bell's ATR Agreement form, he admitted to several violations of his May 20, 2004, rules of parole supervision. (Aff. Johnson, ¶ 17, Ex. H) As part of the ATR, additional rules were added to the previously imposed rules of Bell's supervision. (Aff. Johnson, ¶ 19, Ex. I) Bell was required to attend a cognitive intervention course in addition to the anger management course, noted previously. Also, Bell's supervision rules were amended to include no contact provisions, and a requirement that Bell discuss with his agent his

---

[2]Jones and Bell had a previous relationship, and knew each other from working at a place called Repairers of the Breach (ROTB), a community organization. ROTB has the following function: It is a day time center for the homeless, where they have access to telephone services, hygiene center, free clothing, education services, support groups and many other services. (Aff. Johnson, ¶ 6)

relationships with women. (Aff. Johnson, ¶ 21, Ex. I, p. 2) As a result of this ATR plan, to which Bell agreed, Bell's parole was not revoked. (Aff. Johnson, ¶ 15, Ex. G)

Johnson believes that sound correctional reasons such as public safety and rehabilitation underlie the ATR requirements placed on Bell. (Aff. Johnson, ¶ 22) Prior supervision had been unsuccessful because Bell failed to obtain consent from his agent when changing his residence, engaged in aggressive behavior toward women, and he reported false information to his agent. Therefore, these actions needed to be addressed. (Aff. Johnson, ¶ 27; Aff. Lyon, ¶ 8; Exs. C and D)

Finally, P&P Agent Mark Zbieranek supervised Bell's parole from August 2004, until December 8, 2005, at which time Bell was discharged from parole supervision.[3] On December 31, 2004, Bell called Zbieranek and left a message that he did not want his girlfriend, Kathleen Johnson, to stay at his residence due to her drug use and prostitution. (Aff. Zbieranek, ¶ 32)

Bell was taken into custody and detained on a parole hold twice in 2005. (Aff. Zbieranek, ¶ 20) On January 21, 2005, Bell was taken into custody following a Repeat Offender Prevention Enforcement Program (ROPE) visit to his residence by a P&P Agent

---

[3]Zbieranek has been employed as a P&P Agent in the High Risk Unit since January of 2000. (Aff. Zbieranek, ¶ 2.) His duties include the following: complete intake/initial review functions in a manner conducive to accurately identifying case needs; initiate appropriate referrals or actions resulting in positive outcomes; supervise caseload to promote compliance with court orders and attainment of operational goals; enforce Court Orders and Conditions of Community Supervision through appropriate follow-up action; promote personal safety; utilize automated systems and computer software programs effectively for case management and the production of documents and reports; conduct interview and investigations; analyze case information; and work with police departments and other agencies to ensure compliance and public safety. (Aff. Zbieranek, ¶ 3) The function of the High Risk Unit is to supervise offenders in the community who are a greater risk to re-offend based on their current offense or offenses, prior record, institutional conduct, and/or prior behavior on previous periods of supervision. (Aff. Zbieranek, ¶ 4)

9

other than Zbieranek. (Aff. Zbieranek, ¶ 21) ROPE visits are unannounced and are a part of the supervision of parolees assigned to the High Risk Unit. Generally, a P&P makes the ROPE visit to the residence of the high risk parolee accompanied by one or more police officers. (Aff. Zbieranek, ¶ 22) A ROPE visit is intended to promote public safety and the parolee's rehabilitation, and may include a routine urine test for controlled substances. (Aff. Zbieranek, ¶ 25) It may not be made by the P&P Agent assigned to supervise a parolee. (Aff. Zbieranek, ¶ 27)

Zbieranek did not participate in the January 21, 2005, ROPE visit, and did not participate in the decision to take Bell into custody as the result of the ROPE visit. (Aff. Zbieranek, ¶ 28) However, subsequently Zbieranek was informed by the P&P Agent involved in the ROPE visit that Bell's on-site urine test was positive for marijuana. (Aff. Zbieranek, ¶ 29) A second urine test during the same ROPE visit had the same result. (*Id.*) Also, Zbieranek was informed by the P&P Agent conducting the ROPE visit that Bell became hostile toward that agent and that she felt threatened. (Aff. Zbieranek, ¶ 30) Bell's girlfriend, Kathleen Johnson, was present and uncooperative during the ROPE visit. (Aff. Zbieranek, ¶ 31)

The P&P Agent conducting the January 21, 2005, ROPE visit ordered that Bell be taken into custody and detained pending an investigation into the possible violation of his parole rules, *i.e.*, use of a controlled substance. (Aff. Zbieranek, ¶¶ 33, 34, Ex. J) A parolee may be taken into custody and detained under Wis. Admin. Code § 328.22(2)(a), (b) and (d) for investigation of an alleged rule violation to determine whether to commence parole revocation proceedings and/or to prevent a possible rule violation by the parolee. (Aff. Zbieranek, ¶ 39)

Zbieranek had explained to Bell the Rules of Community Supervision on September 23, 2004. (Aff. Zbieranek, ¶ 36, Ex. J) At that time, Bell indicated that he was signing the rules "under duress." (Aff. Zbieranek, ¶ 37) Nevertheless, parolees have no veto power over the rules even if they do not agree with them. (Aff. Zbieranek, ¶ 37)

On February 1, 2005, Bell was released from custody after the investigation of the alleged violation was complete. (Aff. Zbieranek,¶ 41) Zbieranek compiled a Violation Investigation Report concerning the January 21, 2005, incident, which he signed. The report included a Milwaukee Police Department report and a DOC lab report on the urinalysis. (Aff. Zbieranek, ¶ 42, Ex. K) Bell's urine sample from January 21, 2005, had been sent to the DOC lab for confirmation of the presence of marijuana. The results came back "negative" but the THC (cannabinoid) level detected indicated possible usage prior to the collection of the urine sample from Bell. (Aff. Zbieranek, ¶ 43, Ex K, pp. 1, 5)

In lieu of revocation, Bell was given a formal warning and was informed of additional parole rules that were being imposed. These rules included no contact with Kathleen Johnson and attendance at CGIP, a cognitive intervention program. Because Bell had reported previously that Johnson had engaged in drug use and prostitution, Zbieranek determined that Bell's continued contact with her would be detrimental to his rehabilitation.

Upon his release from custody, Bell had a face-to-face meeting with Zbieranek in his office where Zbieranek informed Bell of this new condition of parole. Zbieranek also signed and gave Bell a copy of his new Rules of Community Supervision, which contained the new rule precluding contact with Kathleen Johnson, as well as the previously established Rule 16 mandating Bell to report as directed for scheduled and unscheduled appointments with

Case 2:04-cv-00926-CNC   Filed 12/11/06   Page 11 of 23   Document 42

Zbieranek.  (Aff. Zbieranek, ¶ 44, Ex. K, p. 2, Ex. L) Bell signed a statement agreeing to comply with this rule.

Zbieranek was not required to administer a lie detector test to Bell in the course of his investigation.  The issue of controlled substance use was subject to verification by the lab, and a lie detector test was of no substantial use in establishing whether Bell was involved in drug use.  (Aff. Zbieranek, ¶ 45)

The second time that Bell was confined on a parole hold took place in February of 2005.  (Aff. Zbieranek, ¶ 46) On February 17, 2005, Zbieranek received a call from Kathleen Johnson's P&P Agent, who reported that Johnson had been taken into custody. Johnson had told her P&P Agent that she had been living with Bell prior to being taken into custody.  Johnson's P&P Agent reported to Zbieranek that she had confirmed the living arrangement with Bell's landlord.  (Aff. Zbieranek, ¶ 47)

In light of this news, Zbieranek contacted Bell by phone on February 17, 2005. Zbieranek told Bell that he was required to appear at Zbieranek's office the next day in order to discuss his living arrangements.  (Aff. Zbieranek, ¶ 49)  Bell responded that he was not required to report to Zbieranek's office as ordered and accused Zbieranek of trying to set him up.  (Aff. Zbieranek, ¶ 50)

On February 18, 2005, Bell failed to report to Zbieranek's office as ordered. (Aff. Zbieranek, ¶ 51) Consequently, Bell was in violation of Rule 16 and other rules of supervision. (Aff. Zbieranek, ¶ 52, Ex. L, p. 2) Because of Bell's failure to appear at Zbieranek's office as ordered, a warrant was issued on February 18, 2005, for Bell's apprehension. (Aff. Zbieranek, ¶ 53)  On February 22, 2005, Zbieranek received a call that Bell had been arrested.  (Aff. Zbieranek, ¶ 54)

On February 16, 2005, prior to the report that Bell was residing with Johnson, Bell called Zbieranek and indicated that he was not going to his cognitive intervention group due to a conflict in his schedule. However, Zbieranek did not give Bell permission to skip the group session. (Aff. Zbieranek, ¶ 55)

Bell was taken into custody on February 22, 2005, and detained again pursuant to Wis. Admin. Code § DOC 328.22(2). (Aff. Zbieranek, ¶ 56) Zbieranek obtained a statement from Kathleen Johnson and received a call from Bell's landlord stating that Bell and Johnson were evicted because of the problems they created. (Aff. Zbieranek, ¶ 57)

Later, Zbieranek concluded that Bell had given conflicting stories about his failure to attend the cognitive intervention group session. Zbieranek found out from the group staff that Bell had contacted them with a story that he was sick and unable to attend. (Aff. Zbieranek, ¶ 59)

On February 22, 2005, Zbieranek issued a violation investigation report concerning Bell, which included the Milwaukee Police Department report of his arrest and written statements by Johnson and Bell. (Aff. Zbieranek, ¶ 60, Ex. M) In the violation report, Zbieranek indicated that Bell had been in violation of several rules of parole because of his contact with Johnson, his failure to attend his required cognitive intervention group, and his failure to report to Zbieranek as ordered. (Aff. Zbieranek, ¶ 61, Ex. M, p. 1) Bell was given the option of agreeing to an ATR in lieu of revocation of his parole and imprisonment. This option was offered to Bell after Zbieranek's supervisor agreed that it was the appropriate resolution of Bell's violations. (Aff. Zbieranek, ¶ 62, Ex. N)

In the ATR Agreement signed by Bell, (Ex. N), Bell admitted that he had violated the rules of his parole supervision, as stated in the ATR Agreement. (Aff. Zbieranek, ¶ 63,

Ex. N) Bell was again referred to the cognitive intervention group, and a Transitional Living placement was made for him. (Aff. Zbieranek, ¶ 64) Bell was released from custody at the Milwaukee Secure Detention Facility (MSDF) on March 17, 2005. At that time, he reported to Zbieranek's office and Zbieranek conveyed Bell to the Transitional Living Facility. Zbieranek was not involved in any other actions to place or retain Bell in custody. (Aff. Zbieranek, ¶ 65)

In Zbieranek's opinion, the new rules of parole imposed on Bell on February 1, 2005, and the ATR requirements imposed in March of 2005, had sound correctional bases and were in furtherance of public safety and for Bell's rehabilitation. (Aff. Zbieranek, ¶ 66) Zbieranek was not required to give Bell a lie detector test in conjunction with his second detention. Usual investigatory methods such as interviewing witnesses and obtaining statements from them were sufficient, and more reliable than a lie detector test as sources of information upon which to make decisions concerning Bell's custody. (Aff. Zbieranek, ¶ 67)

At no time did Zbieranek participate in placing or retaining Bell in custody on a parole hold without a good correctional basis in light of applicable DOC rules and the information available to him. Also, Bell's detention was in furtherance of public safety and Bell's rehabilitation. (Aff. Zbieranek, ¶ 70)

Glenda Meeks supervised Unit 323, the Milwaukee Mental Health Unit, from April of 2001, to July of 2005. From July of 2005, to the present, Meeks supervised Comprehensive Unit 326. (Aff. Meeks, ¶ 4) The function of the Mental Health Unit is supervising offenders who have been diagnosed with a severe mental illness. The unit works very closely with the courts and other community agencies that focus on people with mental

health issues. Further, the Mental Health Unit supervises clients who have been found not guilty by reason of insanity or mental defect. (NGI) (Aff. Meeks, ¶ 5)

In the course of Meeks' duties she has become familiar with the rules applicable to probation and parole supervision, including Wis. Admin. Code § DOC 332.15 which states:

> The department may require an offender who is a sex offender to submit to the lie detector examination process in accordance with s. DOC 332.17 as a condition of supervision.

This rule is reflected in the standard Rules of Community Supervision as Rule 17, as follows:

> 17.  You shall submit to the polygraph (lie detector) examination process as directed by your agent in accordance with Wisconsin Administrative Code 332.15. (Aff. Meeks, ¶ 6)

Wisconsin Admin. Code § DOC 332.15 applies to sex offender probationers and parolees only (Aff. Meeks, ¶8) and provides that the DOC may require a sex offender probationer or parolee to submit to a lie detector examination. However, § DOC 332.15 does not require any Probation and Parole Agent to mandate such an examination. (Aff. Meeks, ¶ 7) Because Bell was not a sex offender, Wis. Admin. Code § DOC 332.15 did not apply to him. (Aff. Meets, ¶ 9)

Meeks became familiar with Bell and his supervision while he was on parole. In the course of her duties, Meeks has supervised P&P Agents Lyon and Johnson. However, Zbieranek has never worked in a unit that she supervised. (Aff. Meeks, ¶ 10) Further, Meeks has never supervised the High Risk Unit. (Aff. Meeks, ¶ 11)

Bell was transferred to the High Risk Unit in August of 2004 due to the nature of his offense and his behavior demonstrating that he was in need of more intensive supervision for public safety and rehabilitation. Bell had been involved in a disturbance on May 9, 2004, which resulted in a Milwaukee City Ordinance citation, and his detention in June

15

of 2004. (Aff. Meeks, ¶ 12) Meeks was not the supervisor who authorized Bell's custody in January of 2003, as she was on vacation when that occurred. (Aff. Meeks, ¶ 24) However, she authorized Bell's release later in January of 2003, after she had returned from vacation. (Aff. Meeks, ¶ 25) At that time, Meeks felt there was insufficient evidence to seek revocation of his parole supervision. (Aff. Meeks, ¶ 28) After his release from custody, Bell reported to Meeks' office. He was very angry about being placed in custody, and Meeks explained the DOC policy to him. (Aff. Meeks, ¶ 29)

Meeks authorized Bell's detention on a parole hold in June of 2004. (Aff. Meeks, ¶ 30) She understood that Jones was not currently Bell's girlfriend, but someone with whom he had a prior relationship. Jones had contacted the person covering for his P&P Agent and complained about Bell's behavior. (Aff. Meeks, ¶ 33) Jones said Bell had been stalking and harassing her, and had accused her of sleeping with Calvin Moore, a manager at ROTB. (Aff. Meeks, ¶ 34)

Meeks also received phone calls from the ROTB director indicating that Bell was harassing Jones and other staff. As Meeks understood from the director, Bell was upset because he thought Jones was romantically involved with another ROTB staff member. (Aff. Meeks, ¶ 35) The ROTB director indicated that Bell was asked not to attend ROTB for a while until matters would be cleared up. According to the director, Bell was following Jones around town harassing her. (Aff. Meeks, ¶ 36) Also, the director advised that a few days after being told not to come to the ROTB, Bell called and said he had to come pick up something that he left there. While Bell was at ROTB, a fire was set in the garbage can. The director was told by people attending the facility that Bell admitted to setting the fire. (Aff. Meeks, ¶ 37) Based on these allegations of Bell's involvement in assaultive and dangerous conduct under § DOC

16

328.22(1), it was mandatory that Bell be detained pending an investigation. (Aff. Meeks, ¶ 37)

Meeks authorized this detention and concluded it was appropriate considering the nature of Bell's offense and his problematic supervision history. (Aff. Meeks, ¶ 39)

Bell was released from custody on June 21, 2004, after unsuccessful attempts to complete the investigation. DCC's could not contact Jones and it was not able to obtain eye-witness testimony that Bell had started the fire. (Aff. Meeks, ¶ 40) Bell's parole was not revoked after he requested and signed an Alternative to Revocation. (Aff. Meeks, ¶ 41, Ex. Bell admitted that he had violated rules of his parole supervision as set forth in the ATR Agreement. The Rules of Supervision referred to in the ATR Agreement are the same rules contained in the May 20, 2004, standard Rules of Community Supervision for Bell. (Aff. Meeks, ¶ 42, Exs. G, H)

Bell admitted that he had violated rules of his parole supervision by contacting Jones by phone and in person against her will and causing her to be afraid for her safety. (Aff. Meeks, ¶ 43, Ex. G) He admitted violating the rules of parole supervision by his confrontational outburst directed toward Calving Moore, a manager at the ROTB, causing Moore to fear for his safety. (Aff. Meeks, ¶ 44, Ex. G) Bell further admitted that he violated a rule of parole supervision by being verbally abusive toward staff at the ROTB and that it was his behavior which caused him to lose his volunteer position at that facility. (Aff. Meeks, ¶ 45, Ex. G) In addition, Bell admitted that he violated the rules of his parole supervision by failing to comply with a request from ROTB to leave the facility for one week. (Aff. Meeks, ¶ 46, Ex. G)

17

As an ATR condition, Bell agreed to participate in the Electronic Monitoring Program (EMP). (Aff. Meeks, ¶ 47, Ex. G) In addition, new rules o f supervision were imposed on Bell, including the requirement that he have no contact with Jones, Moore, and the ROTB. In addition, Bell was directed to inform his P&P Agent of all his female relationships. (Aff. Meeks, ¶ 48, Ex. I) Meeks was not otherwise involved in any actions affecting Bell's custody and detention. (Aff. Meeks, ¶ 49)

At no time was Meeks required to use a lie detector test in conjunction with any decision to detain Bell on a parole hold, or in conjunctions with any investigation related to Bell's custody or release from custody. Also, at no point in conjunction with Bell's detention in custody on a parole hold, or in conjunction with any investigation related to Bell was there a substantial correctional reason to conduct a lie detector test on Bell. (Aff. Meeks, ¶ 50)

At no time did Lyon or Meeks participate in placing or retaining Bell in custody on a parole hold without a good correctional basis in light of applicable DOC rules and information available to them. Lyon, Johnson, Zbieranek and Meeks state that they did not treat Bell in an unprofessional manner at any time; nor did they discriminate against Bell with any improper motive. Further, Lyon, Johnson and Zbieranek did not act against Bell with any personal animus. (Aff. Johnson, ¶ 24; Aff. Lyon, ¶ 34; Aff. Zbieranek, ¶ 68; Aff. Meeks, ¶ 52) Lastly, Lyon, Johnson, Zbieranek and Meeks did not treat Bell differently than any other parolee who had a serious assaultive prior offense and a problematic supervision history. (Aff. Johnson, ¶ 25; Aff. Lyon, ¶ 35; Aff. Zbieranek, ¶ 69; Aff. Meeks, ¶ 54)

Bell is no longer on parole supervision, and therefore no longer subject to the rules and conditions of parole supervision, including arrest and detention on parole holds. (Aff. Zbieranek, ¶ 6) Moreover, he was not a sex-offender, supervised as such under Wis.

18

Admin. Code. Ch. DOC 332 (Aff. Zbieranek, ¶ 7), and not subject to the lie detector provisions of the Wis. Admin. Code § DOC 332.15 (Aff. Zbieranek, ¶ 8)

## CONCLUSIONS OF LAW

The court allowed Bell to proceed on his September 29, 2005, amended complaint which alleges that his due process and equal protection rights were violated while incarcerated on four separate probation holds. Bell seeks $100,000,000 from the remaining four defendants claiming he was "fraudulently placed many times in custody," due to the defendants' failure to give him a "polygraph test" consistent with "Rule 17" and "Wisconsin Adm. Code 332.15."

At the outset, defendant William C. Johnson must be dismissed because he did not have the requisite personal involvement in any actions concerning the plaintiff. It is well established that liability under § 1983 must be based on a defendant's personal involvement in the constitutional violation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995); *Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir.1994). Bell was under Johnson's supervision during one of the four parole holds. However, Johnson filed an affidavit averring that he was on vacation while Bell was confined and did not return to work until the day that he was released (June 14, 2004 - June 21, 2004). Johnson further averred that he did not participate in decisions regarding Bell's confinement and release, did not participate in the investigation into allegations concerning Bell underlying his confinements, and did not participate in the decision to release Bell on an Alternative to Revocation agreement.

While Bell's summary judgment motion was filed under oath, he specifically stated that the motion was filed "without supporting affidavits." Moreover, he declined to file a brief in opposition to defendant's motion. Further, Bell's motion does not contradict

19

Johnson's affidavit nor does it contain admissible evidence which creates a genuine issue of material fact. To survive summary judgment, Bell cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Therefore, in the absence of evidence in this record that Johnson had any involvement with Bell's probation hold, he cannot be liable under § 1983.

Next, Bell's amended complaint is based on the erroneous assertion that he was entitled to take a lie detector test. Bell maintains that had he been permitted to take a lie detector test, he never would have been incarcerated. His motion for summary judgment asserts repeatedly that Rules 17 and 18 of the Community Supervision Rules require that he "be held accountable to take a polygraph test." These contentions cannot be sustained.

First, the defendants are entitled to qualified immunity. Qualified immunity is a two-part test. First, the court decides whether "[t]aken in the light most favorable to the party asserting the injury," the "facts alleged" show that defendant's conduct violated a constitutional right. *Katz v. Saucier*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If no constitutional right was violated, there is no need for further analysis of the qualified immunity issue. *Id.* However, if a violation could be demonstrated based on a favorable view of the parties' submissions, the analysis proceeds to the second step, which requires the court to determine whether the right was clearly established. *Id.*

There is no statutory or constitutional right to a lie detector test before being detained on a parole hold. Moreover, on virtually every page of his motion for summary judgment, Bell cites to Rules 17 and 18 of the standard Rules of Community Supervision. Bell

did not attach the rules, but they are appended to the affidavit of William C. Johnson. These rules, signed by Bell, provide as follows:

> 17. You shall submit to the polygraph (lie detector) examination process as directed by your agent in accordance with Wisconsin Administrative Code 332.15.
> 18. You shall pay fees for the polygraph (lie detector) examination process as directed by your agent in accordance with Wisconsin Administrative code 332.17(5) and 332.18 and shall comply with any required Wisconsin Department of Corrections procedures regarding payment of fees.

These rules do not require a P&P Agent to administer a polygraph. More importantly, Wis. Admin. Code § DOC 332.15, et seq., applies only to sex offenders. Bell is not a sex offender; therefore, this provision of the code and the corresponding rules of supervision do not apply to him.

For the same reasons, the allegations fail on the merits. Bell has not come forward with any evidence that his due process rights were violated. As discussed above, he has failed to identify any federal or state law that required a lie detector test before the imposition of a parole hold. It is mere speculation that Bell would have been exonerated and the court is not aware of any authority which requires such a test. Moreover, Bell has not identified any other similarly situated parolee, particularly someone with a comparable offense and supervision history, to establish a violation of the equal protection clause.

Although Bell cites to Chapter 328, he neglects Wis. Admin. Code 328.22, which states:

> (1) A client shall be taken into custody and detained if the client is alleged to have been involved in assaultive or dangerous conduct. A regional chief may permit exceptions to this subsection.

(2) A client may be taken into custody and detained:

> (a) For investigation of an alleged violation by the client;
>
> (b) After an alleged violation by the client to determine whether to commence revocation proceedings;
>
> (c) For disciplinary purposes; or
>
> (d) To prevent a possible violation by the client.

As such, it is clear that seizure and detention are part of the supervision process. Even under the Fourth Amendment, "the seizure of a parolee requires something less than probable cause to be reasonable. . . ." *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003). Because of a parolee's reduced privacy interest and the government's interest in monitoring those who have already demonstrated an inclination to violate the law, the government need only have reasonable suspicion that a parolee has violated a term of his parole to detain him. *Id.* Reasonable suspicion is "something less than probable cause but more than a hunch." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).

Here, the undisputed facts establish that each of Bell's parole holds was based on reasonable suspicion. Bell was transferred to the High Risk Unit in August of 2004 because the underlying offense involved the strangulation death of a woman during a robbery, and his prior supervision had been unsuccessful. The four separate parole holds complained of by Bell between 2003 and 2005 involved allegations of assaultive or aggressive conduct toward women, positive tests for drugs, and failure/refusal to report to the P&P Agent as ordered. In addition, there is no evidence of falsified records, improper motive, or personal animus.

Now, therefore,

IT IS ORDERED that defendants' motion for summary judgment is granted.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is denied.

IT IS FURTHER ORDERED that plaintiff's motions of December 5, 2006, seeking declaratory relief and compensatory settlement are denied as moot.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 11th day of December, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE